STATE of Wisconsin, Plaintiff-Respondent,†

v.

Michael L. SEIBEL, Defendant-Appellant.

Court of Appeals

*No. 90-0895-CR. Oral argument October 23, 1990.—Decided November 27, 1990.*

(Also reported in 464 N.W.2d 86.)

† Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on a brief and orally argued by *Michael Yovovich,* assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *Donald J. Hanaway,* attorney general, and *Thomas J. Balistreri,* assistant attorney general, and orally argued by *Thomas J. Balistreri.*

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J. Michael Seibel appeals an order denying his motion to suppress evidence of intoxication obtained from a blood test.[1] Seibel argues that the state lacked probable cause to draw Seibel's blood following a fatal traffic accident, and, therefore, the drawing of his blood constituted an illegal search, the fruits of which must be suppressed. Because we conclude that the fourth amendment requires that the police have probable cause to search before drawing blood and because the state concedes that it lacked probable cause, we reverse the trial court's order.

On October 14, 1989, Seibel and several friends were riding their motorcycles north on Highway 53. Seibel drifted across the centerline as a Ford Taurus came around a curve in the southbound lane. The Taurus and the motorcycle collided, causing the Taurus to slide into the northbound lane where another car hit it. Both occupants of the Taurus died from injuries sustained in the accident. Seibel was taken to the hospital.

Several officers responded to the scene. They spoke with the driver of the vehicle immediately behind the group of motorcycles. She witnessed the accident and stated that it occurred after Seibel had drifted about one foot over the centerline. The officers examined the acci-

---

[1]This court granted leave to appeal a nonfinal order on May 14, 1990.

dent site and determined that the location of the skid marks, oil streaks and debris was consistent with the driver's statement. One of the officers smelled the odor of intoxicants coming from at least one of Seibel's friends, who had remained at the accident site. Based on this information, the officers at the scene radioed to Officer Deborah McMenamin and instructed her to go to the hospital and have blood drawn from Seibel. McMenamin went to the hospital, arrested Seibel for OWI and read the "Informing the Accused" form to him. Seibel then submitted to having his blood drawn. The results revealed a blood alcohol level of .266%. None of the officers who observed Seibel noticed any signs of intoxication. One officer thought he smelled the odor of intoxicants on Seibel but, upon repositioning himself and trying again, was unable to detect such an odor.

Following the hearing on the motion to suppress the blood test results, the court ruled that no credible evidence supported a finding of probable cause to believe Seibel was under the influence of an intoxicant. The court went on to rule, however, that because there was probable cause to arrest Seibel for homicide by negligent operation of a motor vehicle and reason to suspect that Seibel may have consumed alcohol and because Seibel's degree of intoxication may be relevant to the charge of homicide by negligent operation of a motor vehicle, the search was reasonable.

The issue on appeal is whether the fourth amendment requires that officials have probable cause to search before they draw blood incident to an arrest for homicide by negligent operation of a motor vehicle.[2] The

[2]The state argues neither that the police had probable cause to arrest for OWI nor that Seibel consented to the search. Seibel concedes that the authorities had probable cause to arrest for negligent homicide.

relevant facts are undisputed. Thus, we independently apply constitutional principles to those facts. *Village of Elkhart Lake v. Borzyskowski,* 123 Wis. 2d 185, 189, 366 N.W.2d 506, 508 (Ct. App. 1985).

We begin our analysis with the lead case, *Schmerber v. California,* 384 U.S. 757 (1966). In that case, the police arrested the defendant at a hospital where he was receiving treatment for injuries sustained in an automobile accident. Following the arrest, the police ordered blood drawn from the defendant. At trial, the defendant contended that the results of the blood test must be suppressed as the fruit of an illegal search. The Supreme Court held that the officer clearly had probable cause to arrest the defendant for driving under the influence. However, the policies justifying a search incident to arrest had "little applicability with respect to searches involving intrusions beyond the body's surface." *Id.* at 769. Thus, the Court held that absent a "clear indication" that the desired evidence would be found, the defendant's interest in human dignity and privacy precluded the officer from drawing blood. *Id.* at 769–70. Because a clear indication did exist, the Court upheld the search.

The most extensive Supreme Court analysis and application of *Schmerber* is found in *Winston v. Lee,* 470 U.S. 753 (1985). In that case, the defendant was arrested for attempted robbery. The state sought to compel the defendant to undergo surgery to remove the bullet fired by the victim. The Court held that such surgical intrusion was unreasonable under the fourth amendment. In making its decision, the Court interpreted

---

Seibel questions whether the fact of intoxication is relevant to a charge of homicide by negligent operation of a motor vehicle under sec. 940.10, Stats. Because the officers lacked the necessary probable cause to search, we need not reach that issue.

*Schmerber* as providing a framework of analysis for cases involving intrusions beneath the skin. *Winston,* 470 U.S. at 760.

The Court stated that *Schmerber* recognized that the usual fourth amendment requirements would remain the threshold requirements for this type of search and seizure. *Id.* at 760. The Court noted the importance of probable cause and a search warrant. *Id.* at 760-61. Because *Schmerber* fit within the exigent circumstances exception to the warrant requirement, no warrant was required. *Id.* at 759.

Beyond these standards, the Court looked at the reasonableness of the search, balancing the magnitude of the intrusion and the individual's interest in privacy and bodily integrity against the state's interest in fairly and accurately determining guilt or innocence. *Id.* at 761-62. The Court concluded that this balancing weighed in favor of the state in *Schmerber* and in favor of the defendant in *Winston.*

In sum, the Court in *Winston* interpreted *Schmerber* as first requiring satisfaction of the fourth amendment—probable cause and a warrant or an exception, such as exigent circumstances—before the police can conduct a search. Once this threshold requirement is met, a court in determining the reasonableness of the blood test must then weigh the individual's interests against those of the state.

Applying this test to the facts in the present case, we conclude the search was invalid. The fourth amendment requires probable cause before officials may conduct a search. *State v. Tompkins,* 144 Wis. 2d 116, 122 423 N.W.2d 823, 825 (1988). At oral argument, the state conceded that the officers did not have probable cause to

318

draw Seibel's blood. The facts warrant this concession. No officer testified that Seibel exhibited any sign of intoxication. One officer thought he smelled an odor of alcohol coming from Seibel but was unable to detect it when he specifically attempted to detect such an odor. Another officer smelled alcohol coming from one or more of Seibel's friends. As the state concedes, these facts do not add up to probable cause.

The state, however, urges us to adopt a standard different from the one developed in *Schmerber* and *Winston*. The state argues that *Schmerber* stands for the proposition that blood can be taken incident to a lawful arrest if there is also a "clear indication" that the evidence sought will be found in the blood. Because "clear indication" means "reasonable suspicion" and because the police had lawfully arrested Seibel, the police only needed a "reasonable suspicion" that his blood would yield evidence of intoxication in order to draw the blood.

The state finds its definition of "clear indication" in *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985). That case involved the lengthy detention by customs officials of a Colombian native at Los Angeles International Airport. The Court held that the officials were justified in the detention because the facts supported a reasonable suspicion that the defendant was an alimentary canal smuggler.

The court of appeals had held that the detention was impermissible because the facts did not support a "clear indication" of alimentary canal smuggling. *United States v. Montoya de Hernandez*, 731 F.2d 1369, 1372 (9th Cir. 1984). Federal courts have used this standard in analyzing body cavity border searches since the court in *Rivas v. United States*, 368 F.2d 703, 710 (1966), adopted that language from *Schmerber*. The Supreme Court in *Montoya* stated that *Schmerber*'s "clear indica-

tion" language indicated the need for a "particularized suspicion" that the desired evidence might be found within the detainee's body, rather than enunciating a third fourth amendment standard. *Montoya,* 473 U.S. at 540.

*Montoya* is not a search case and is irrelevant to the issue in the present case. The Court specifically declined to decide the level of suspicion necessary to justify searches at the border. *Id.* at 541 n.4. The Court limited its holding to the question of whether the lengthy detention was justified based on the customs agent's reasonable suspicion that the detainee was smuggling drugs. *Id.* at 541.

The state argues that *Schmerber* provides the proper test to apply to the instant facts except that "reasonable or particularized suspicion" should be substituted for "clear indication." The state asserts that *Winston* is distinguishable because the proposed search in that case was to be conducted pursuant to a warrant some time after the incident. According to the state, the officials in *Winston,* unlike those in *Schmerber* or the present case, had no prior justification, such as search incident to arrest, for conducting the search. The state thus argues that incident to a lawful arrest, officials can draw blood for evidence of the crime if they have a reasonable suspicion that the desired evidence will be found in the blood.

The state's position ignores the clear language of *Winston* and misconstrues the rationale underlying the search incident to arrest exception to the fourth amendment. The *Winston* Court specifically adopted and applied *Schmerber.* The Court interpreted *Schmerber* as providing a framework of analysis for such cases. One might argue that *Schmerber* did not compel the *Winston*

320

Court to conclude that *Schmerber* requires officials to have probable cause to search in order to intrude beneath the skin even though the defendant was under arrest and the search was incident to that arrest. However, the *Winston* Court chose not to distinguish *Schmerber* on the incident to arrest basis. Rather, the *Winston* Court clearly interpreted *Schmerber* as recognizing "that the ordinary requirements of the Fourth Amendment would be the threshold requirements" for this type of search. *Id.* at 760. It is not for this court to second-guess how the United States Supreme Court interprets its own prior decisions.

Our analysis of *Winston* and *Schmerber* is the same as that used by the court in *Hammer v. Gross*, 884 F.2d 1200 (9th Cir. 1989). That court also interpreted *Winston* and *Schmerber* as first requiring satisfaction of the fourth amendment's probable cause and warrant requirements before police could draw blood. *Hammer*, 884 F.2d at 1204–05.

■

The state contends that the fact of arrest justifies a lower level of suspicion than would otherwise be required to search beneath a suspect's skin. We disagree. The law recognizes that a search may be made incident to a lawful arrest. *Schmerber*, 384 U.S. at 769; sec. 968.11, Stats. Such searches may be made of the person arrested and the area within that person's immediate control for purposes of protecting the officer, preventing escape and seizing fruits and evidence of the crime that otherwise might be destroyed. *State v. Fry*, 131 Wis. 2d 153, 165, 388 N.W.2d 565, 570 (1986); sec. 968.11, Stats. In *Fry*, the court expanded the interpretation of "area within that person's immediate control." However, no decision has held that arrest alone is sufficient to justify a search. Even *Fry* requires that the defendant must still be at the

scene of arrest such that, theoretically at least, he could grab a weapon or destroy evidence. *Id.* at 174, 388 N.W.2d at 574.

The only purpose underlying the search incident to arrest exception to the fourth amendment that might arguably justify drawing Seibel's blood would be preventing the destruction of evidence. This court recognizes, as did the Court in *Schmerber,* that one's blood alcohol level diminishes over time. However, the Court in *Schmerber* noted this physical fact in considering the exigency of the situation. The delay in obtaining a warrant might cause a reasonable officer to believe that evidence would be destroyed. Therefore, no warrant was necessary. *See id.* at 770; *Winston,* 470 U.S. at 759. While this fact may dispense with the warrant requirement, the Court in *Schmerber* rejected the possible destruction of evidence as a justification for drawing blood incident to arrest. *Schmerber,* 384 U.S. at 769. The fact that time destroys evidence of intoxication goes to the exigency of the situation rather than providing a justification to search incident to arrest.

As the Court in *Schmerber* noted, "[the] overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the state." *Id.* at 767. The fact of arrest does not diminish a person's interest in being free from such intrusion. We accordingly reject the state's position that arrest justifies a lower level of suspicion necessary for the police to draw blood.

*By the Court.*—Order reversed.